AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
| vs. | CASE NUMBER: 8:02-m- |
| TIFFANY BROOKE FOWLER, GORDON SEAN McWHORTER, and SHAE LYNN SAUR | 8:02-M-317 TBM |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least as early as on or about May 9, 2002 through the present, in Hillsborough County, in the Middle District of Florida, and elsewhere, the defendants did conspire to commit the theft and transportation in interstate commerce of a thing of value of the United States, in violation of Title 18, United States Code, Sections 371, 641, and 2314. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

I certify the foregoing to be a true and correct copy of the original.
SHERYL L. LOESCH, Clerk
United States District Court
Middle District of Florida
By: _____ Deputy Clerk

Signature of Complainant
Wayne Nichols Nance, Jr.
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 22, 2002      at      Tampa, Florida

Thomas B. McCoun
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

1. I, Wayne Nichols Nance, Jr., have been employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) since August 2, 1998. Your affiant has participated in numerous investigations, including several investigations involving theft and interstate transportation of stolen property.

2. Your affiant is authorized to investigate violations of laws of the United States, and your affiant is a law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States.

3. The statements contained in this affidavit are based on your affiant's personal knowledge or information related by other law enforcement officers. This affidavit does not set forth every fact resulting from the investigation; rather, it sets forth facts sufficient to establish probable cause to charge ~~an unknown subject, using the alias ORB ROBINSON and the Electronic mail (E-mail) addresses~~ Tiffany Brooke Fowler, Gordon ~~"orb-robinson@hotmail.com" and "fractalized@yahoo.com"~~, with conspiracy to commit Shac Lynn Sa the theft and transportation in interstate commerce of a thing of value of the United States, in violation of Title 18, United States Code, Sections 371, 641, and 2314.

## Hotmail.com

4. Microsoft Network (MSN) Hotmail (hereinafter "Hotmail") is a subsidiary of MSN, which is located in Mountain View, California. Hotmail provides access to free web-based E-mail accounts, which allows subscribers to communicate with others via the Internet. Each subscriber's E-mail account is identified by the subscriber's E-mail name. Subscribers can access their E-mail accounts from any computer system that is connected to the Internet, and all Hotmail communications are routed through servers located in Mountain View, California. Hotmail routinely stores historical logs of the Internet Protocol (IP) addresses that are used to access a Hotmail account when a subscriber logs on to the Hotmail network.

## Yahoo.com

5. Yahoo.com provides access to free web-based E-mail accounts, which allows subscribers to communicate with others via the Internet. Each subscriber's E-mail account is identified by the subscriber's E-mail name. Subscribers can access their E-mail accounts from any computer system that is connected to the Internet and, thereby, enables the computer system to communicate with a central computer system at Yahoo.com, which is located in Sunnyvale, California.

1

## FACTS AND CIRCUMSTANCES

6. On May 24, 2002, the Tampa FBI Office received an E-mail from a Cooperating Witness (CW), who is a citizen of Belgium, regarding an advertisement placed on the Mineralogy Club of Antwerp, Belgium's (Club) web site on May 9, 2002. The advertisement stated:

> **Priceless Moon Rocks Now Avaliable!!!**
> "Orb Robinson" orb_robinson@hotmail.com
>
> If you have an interest in purchasing a rare and historically
> significant piece of the moon, and would like more
> information, then please contact me by e-mail and leave
> your contact information and an explaniation of your interest.
> Sincerly,
> Orb

The CW, a member of the Club, also received an E-mail from fractalized@yahoo.com stating:

> Greetings. My name is Orb Robinson from Tampa, Fl. I
> have in my possession a rare multi-karat moon rock I am
> trying to find a buyer for. The laws surrounding this type of
> exchange are known, so I will be straight forward and
> noncholant about wanting to find a private buyer. If you, or
> someone you know would be interested in such an
> exchange please let me know.
> Thank you.
>
> Orb Robinson

7. On May 27, 2002, the CW sent an E-mail from Belgium to the Tampa FBI Office, advising the FBI of the CW's E-mail response to **Robinson's** solicitation. The CW responded, in part, as follows:

> Hi Orb,
> If you can provide valid proof that these rocks are really
> lunar samples, I would be willing to buy if the price does not
> exceed 800$/gram for rocks under 10 grams and 600$/gram
> for larger specimens.

2

In reply, **Robinson** E-mailed, using orb_robinson@hotmail.com, in pertinent part:

> Your prices are just fine, in fact I can do better for you then
> that, but I have minimum mass requirements. To give you
> an idea of my mass range I would prefer to stay around 1
> kilogram. The following is the breakdown of the varying
> price range....
> $500/gram (.5 - .64 kg)
> $400/gram (.65 - .85kg)
> $300/gram (.86 - 1.5kg)
> Of coarse, verification will be provided before you purchase.
> I think that if you are seriously interested then we should
> meet and confirm this deal in person.

8. On May 28, 2002, the CW received an E-mail from **Robinson**, using orb_robinson@hotmail.com, which stated, in part:

> Please indicate if you are interested and/or able to purchase
> a rare lunar piece. Timing for me is sensative, so I won't
> waste any of yours. We both know that you would be
> getting a great deal, and if you are still worried that I am
> trying to sell you a fake, good, I don't want you to just take
> my word for it. Please let me address your voiced concerns.
> Just let me know what they are. Aquiring this specemine is
> a sensative matter for me as you can imagine, and that is
> why I have the minimum mass requirement. It is more a
> minimum financial barrier that makes this transaction
> worthwhile for me and my group. So if you are skeptical
> about the validity of the origins of the rock, good, I shall
> provide you with convincing evidence, when I believe that
> you are serious. If you are concerned that you can not
> afford this transaction, I understand. Perhaps you could find
> a significant number of customers that would be interested
> in purchasing pieces of your lunar sample and then would
> have the incentive to make such an investment. Either way,
> even if you are no longer interested, please indicate it to me.

9. On May 30, 2002, the Tampa FBI Office sent the CW an E-mail directing him/her to send an E-mail to **Robinson**. The directed E-mail was sent to **Robinson** at orb_robinson@hotmail.com on May 31, 2002, and stated, in pertinent part:

3

> Hi Orb,
>
> Your prices are better than I hoped for but the specimens are a quite large. You spoke of "multi-carat rocks" but a 500 gram rock would cost me 250.000$ and that is no small change. This amount is far out of my league and I would have to find one or more financial partners. Are these really the smallest rocks you have? I would be more interested in smaller specimens. I could always split up a larger rock for resale but it still is a large investment.
>
> Nevertheless, I can free 100.000$ on reasonably short notice. I would be happy to spend it on a single (authenticated) rock of at least 250 gram. I have however possible buyers for any dust or grit that came off those rocks. Have you any of that and how much would you ask for it? Even minute amounts presented on black glass microscope-slides would possibly sell OK.
>
> I can't free myself from work right now so a meeting in person would have to wait until September. However, my brother and his wife live in Pennsylvania US. I trust them completely and my sister-in-law is somewhat of a hobbyist in mineral collecting. She might be able to verify the rocks origin I think. Would you be willing to deal with me through her?

     10.    On May 31, 2002, **Robinson**, using orb_robinson@hotmail.com, sent the CW an E-mail which stated, in pertinent part:

> In attempt to keep things out in the open between us, I will address my concerns. As you well know, it is illegal to sell Apollo lunar rocks in the united states. This obviously has not discouraged me since I live in the united states. However, I must be cautious that this deal is handled with delicacy in that I am not publicly exposed. This same law that makes it illegal to sell Apollo lunar rocks also for our mutual benefit makes them quite rare and valuable. My projected return from this has been just over $250,000 dollars and I would of coarse prefer to be involved in one business dealing and get it all over at once in order to minimize my personal exposure. Having said that, if I can

4

build some more trust with you, then perhaps I could do a deal with you for $150,000 and then if you find enough buyers you could buy the rest from me. As you can see this decreases my safety and increases my exposure and therefore I would only feel comfortable in doing this if I learned to trust you, which is difficult to do under the circumstances. Maybe you should give me the names of your relatives/contacts in the united states and then have them e-mail me and we shall begin to build a level of trust from that. I could meet them in the united states and then settle our mutual concerns and verify the authenticity of the specimens through them. I can acquire three very unique and valuable specimens and I am waiting to provide you with the details about them until I have built some more trust. One of them does involve dust. Please let me know if it is impossible for you to find some more investors in order to make this in one purchase. I would prefer that over two purchases. Either way I am interested in developing this business relationship with you. And I wish you a hefty profit from our encounter. Please reply with your thoughts and or concerns.

11. On June 4, 2002, the Tampa FBI Office sent the CW an E-mail directing him/her to send another E-mail to **Robinson**. The directed E-mail was sent to **Robinson** at <u>orb_robinson@hotmail.com</u> on June 4, 2002 and stated, in pertinent part:

I would prefer to make the first purchase at 100.000$ as we have discussed. If the lunar rocks are proven authentic and all goes well, I will have a much easier time of convincing others to invest and help with a second purchase. I have spoken to my brother and sister-in-law and they would be willing to purchase the lunar rocks for me. As I may have told you earlier, my sister-in-law is a hobbyist in mineral collecting. She has allowed me to provide you her email address, which is Lynn.Briley@verizon.net and said she'd be willing to stand in for me in this initial transaction. Although I trust my sister-in-law, I do not necessarily trust her abilities completely. How will you provide that the lunar rocks you offer are real? Can you provide me some documentation as well? Are they meteorites or samples from one of the Apollo missions?

     **12.**    On June 4, 2002, **Robinson**, using orb_robinson@hotmail.com, sent the CW an E-mail which stated, in pertinent part:

> Since I am confident of the authenticity of these rocks, I will hope that you are able to find many customers quickly after our fist transaction, and will for now continue planning on making this transaction. I will e-mail your sister-in-law and begin setting up a meeting time and location. You make sure she is prepared to pay in cash, and I'll make sure that she has all the relevant documents and publications on the individual specemins. The type of proof I will be providing will be the scientific publications, which can be easily verified and reproduced by you. In these documents / publications, there are quantitative measures describing the samples, photos, and unfakable descriptions of them. I encourage you to have your sister-in-law bring all the scientific equipment she has access to if she wants to double and triple check the samples for the accurate properties. I can not alert you as to which exact samples will be involved before the trade, because the exposure becomes. However, I understand that during a transaction she, and I assume that her husband will be there for her protection, will want to have ample time to check the samples before purchase. So we will discuss the details of the transaction at great detail before it takes place. Please continue to stay in touch with me, and inform me of any changes, concerns, or updates.

     **13.**    On June 4, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail message to Lynn.Briley@verizon.net, which stated:

> Lynn,
> [CW] has informed me that you will be his contact for our transaction. If this is correct please e-mail me back. Please ask any questions, or address any concerns.
> Orb

     **14.**    On June 5, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to the CW which stated, in pertinent part:

> One more thing.... I forgot to answer your question. Yes the samples are from the Apollo collection, not meteorites.

6

15. On June 6, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com. All E-mails sent by your affiant to **Robinson** were sent from Tampa, Florida. Moreover, all E-mails sent by **Robinson** to your affiant were received in Tampa, Florida. The June 6, 2002 E-mail stated, in pertinent part:

> Yes, Orb, I'll handle this for [CW]. [He's/She's] explained to me a good bit about what we're doing and the need for caution and discretion.
>
> It seems to me that you and I are going to have to make arrangements to meet somewhere to make sure we're getting what we think we are. This is a rare opportunity, and calls for us to be very careful.
>
> When and where are we going to be able to get together? I travel a good bit, but will certainly make arrangements to see the "merchandise" wherever might be necessary. I understand you're in Tampa, Florida. I certainly wouldn't mind taking a trip to Florida;-)

16. On June 6, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Lynn,
> It is good to hear from you. I suggest that we plan a meeting time for our transaction. I should point out that I intend to meet only once for each transaction, not once to show off the specemins and then again if you decide to buy. This simply means that if we meet that you should be prepared to buy then or never. I don't want to increase my exposure by multiple encounters. I think that you and Orb will be pleased from the deal that I am offering, and I am confident that you both will profit a great deal from this. I would prefer not meeting in my area, so I suggest meeting in New Orleans. I'll provide further details after I hear back from you. Please provide 3 times, (weekend dates) that you could make it out to this area. You may bring one person with you and I will have two people on my end. What I need you to do for me at this point besides confirming your availibility to meet, is a description of your expectations. This will help me eliminate or clear up any possible confusions.

7

17. On June 7, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at <u>orb_robinson@hotmail.com</u>, which stated, in pertinent part:

> To be quite honest, I am concerned about some things regarding your last e-mail. First, you stated, "I think that you and **Orb** will be pleased from the deal that I am offering . . . ." I thought you were Orb!?! . . . . Second, you state that you want to meet in New Orleans, which is not where you live or where I live, and, therefore, makes me wonder if our meeting is really some sort of set-up or if your offer is just a hoax. Third, you state that I may bring one person along while you will be bringing two people along. Is that so you will have an advantage by numbers and attempt to rob us? This is all very unsettling to me.

18. On June 9, 2002, **Robinson**, using <u>orb_robinson@hotmail.com</u>, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Yes my name is not Orb. But I don't believe that you expected me to go under my real name either did you? I have sought out you and therefore in the process have found many others that did not like the fact that I am selling such an item. . . . I'll tell you that I am in Houston. This is where I made contacts that were able to acquire the items at hand. This is also why I need to be VERY careful, because I am near all of the political business that may fall if this doesn't go smoothly. . . . my party would have two people also, just as your does. . . .Then if you intend on looking at the samples without your husband, then I will leave my friend out of it until the actual transaction also. . . . I can not risk walking into a place like an airport with the samples on me. Obviously, this is because there is nothing to stop someone from searching me and then charging me. . . . After you are able to verify the authenticity of the samples then we can meet your husband and I will then invite my friend to join us. . . . I must wait to give you the documentation because I can not risk letting the information as to which samples are out. . . . The documents that I will be providing will be the acutal scientific papers writen by the NASA scientists whom have studies these individual specemins. These documents list all kinds of physical properties of the individual specemins which will allow you to

8

be confident of them. I hope I have cleared up my
miscommunication on the number of people I intend to be
with. Just me and then one friend during the transaction. I
hope I have cleared up the reason that I have an alias also.

19.    On June 10, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at <u>orb_robinson@hotmail.com</u>, which stated, in pertinent part:

> On a somewhat selfish note, I had my heart set on going to
> Florida. I was going to combine the meeting with a few days
> of vacation for me and my husband. Is there any way you
> would consider meeting me/us in Florida? It certainly
> doesn't have to be Tampa. How about Orlando?

20.    On June 10, 2002, **Robinson**, using <u>orb_robinson@hotmail.com</u>, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> I'm not exactly sure yet but for now lets plan on the weekend
> of July 20-21st. I'll see if I can arrange getting out to Florida
> on that weekend. . . . One thing you can do right now is look
> up any scientific articles published on the moon rocks by
> NASA's scientists so that you are familiar with them. You
> should be able to find these in any technical library. Let me
> know if you have difficulties. All samples have "tag"
> numbers that identify them, if you had a list of physical
> discriptions that went with the "tag" numbers and were
> familiar with the regular proceedures done for testing of the
> rocks at NASA I think you would have a good background
> for this.

21.    On June 11, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at <u>orb_robinson@hotmail.com</u>, which stated, in pertinent part:

> As far as our meeting time, the weekend of July 20-21 is
> fine. My husband and I had a long talk last night about the
> whole proposition and are prepared to go through with it. My
> husband and [CW] are attempting to work out the financial
> aspects. [CW] has a friend in the banking business and
> thinks [he/she] can make it appear that [he/she] is involved
> in a real estate transaction when [he/she] transfers the
> money to our bank. . . . Assuming that [CW] successfully
> transfers the money to us, we are still thinking of a way to

> withdraw it in cash without calling attention to ourselves.
> ... Perhaps we can meet at a restaurant somewhere very
> PUBLIC like Disneyworld.

**22.** On June 11, 2002, your affiant received subpoenaed information regarding the E-mail address orb_robinson@hotmail.com from Hotmail. The information provided that the subscriber to said E-mail address was **Orb Robinson** and listed IP addresses, times and dates that E-mails were sent by the subscriber. Your affiant researched the IP addresses and learned that the subscriber was sending E-mails from various computers located at the University of Utah through May 9, 2002 and, beginning May 23, 2002, both from Johnson Space Center (JSC) and a public library in Houston, Texas.

**23.** On June 12, 2002, your affiant conducted research of the University of Utah's academic calendar via the Internet. The research findings revealed that the final examination period for the Spring semester ended on May 9, 2002.

**24.** On June 12, 2002, your affiant conducted research of JSC via the Internet. The research findings revealed that the National Aeronautics and Space Administration (NASA) hosts 10-week summer on-site fellowships at JSC for full-time engineering and science educators from United States colleges and universities. The fellowships began in late May 2002.

**25.** On June 16, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

> I haven't heard from you in several days and we are
> wondering now if this whole thing was some sort of hoax. If
> so, the joke's on us. I really hope it's not. ... If in fact you
> weren't serious, please let us know. ... We all hope you
> weren't just kidding. Please let us know either way.

**26.** On June 19, 2002, your affiant obtained a listing entitled, "2002 Summer Faculty Fellows at JSC" through the NASA-Office of Inspector General (OIG). The listing showed that one Fellow is a University of Utah professor, who had a graduate student accompany him to JSC. The listing also showed that the University of Utah professor was returning to JSC to continue work performed last summer.

**27.** On June 21, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

10

>Just wanted to stay in touch and let you know that
>everything is still good on my end.

28. On June 21, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

>Regarding our meeting with each other, do you want me to
>suggest a meeting spot? I/we are not familiar with Orlando,
>but I could certainly do some research and come up with a
>safe and public area.

29. On June 24, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

>Let's plan on meeting at a restaurant in Disney World (you
>pick because I haven't been) around 6:00 on saturday, July
>20th. What day are you planning on leaving from home to
>head out to Florida? I need to know so I can try and get
>some faxes to you before then. I probably won't be leaving
>from Houston until friday so just to make sure I will be there
>on time I would prefer a dinner meeting. Everything is good
>on this end still. I feel as comfortable as I hoped to feel
>about this so far, so thank you for your good and continued
>communication.

30. On July 3, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

>A friend recommended a restaurant named Italiannis that
>supposedly has the best veal parmesian in the entire world
>and is very close to Disneyworld. It is on a main drag (and
>should be relatively easy to find I hope) in Orlando called
>International Drive. The exact address is 8148 International
>Drive, Orlando, FL 32819. I have mapped it out and it is
>convenient to where we are staying. I hope this is okay with
>you.
>
>I would like a few days to examine the documentation you
>are sending me. The fax number I will be giving you is
>actually my employer's, so please don't send it without
>letting me know first.

11

31. On July 8, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Ok things are still going well. I will send you info next week.
> Thanks for keeping in touch. That restaurant will work just
> fine for me.

32. On July 13, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which provided a facsimile number. The facsimile number is subscribed to by the FBI. Further, your affiant stated, in pertinent part:

> Speaking of the restaurant, how will I recognize you? Do
> you want to exchange photos?

33. On July 13, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Thanks for the fax number. I will send you the fax on
> wednesday between 8 and 10 central time. . . . You can
> approach me in the restaurant, I will be wearing a black
> colored shirt and a silver necklace with a dolphin pendant.
> Together with that and my arrival time you should have no
> problem picking me out. Thanks for your communication
> and I'll see you next weekend.

34. On July 15, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

> Thanks for getting back with me regarding the
> documentation. Please let me know that you mean AM not
> PM when you plan to fax me.

35. On July 16, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Yes I mean am. I will plan on sending you a fax at 8:00 my
> time which I believe is 7:00 your time tomorrow morning
> (wednesday).

36. On July 17, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

>Hopefully you will read this before you fax the documentation to me. It is Eastern time here, which is one hour ahead of Central time. That means it will be 9:00 AM here if you send me a fax at 8:00 AM your time. That will be ok, though.

**37.** On July 17, 2002, your affiant received a telephone call from the NASA-OIG and was advised that a 600-pound safe containing lunar samples from every Apollo mission that landed on the moon was discovered missing from JSC sometime during the weekend of July 12-14, 2002.

**38.** The National Aeronautics and Space Act, 42 U.S.C. § 2451 et seq., authorizes NASA "to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of its operations and the exercise of the powers vested in it by law." To carry out its statutory mandate, NASA has implemented policy directives that govern its programs and goals. An early policy statement expressly provided that "lunar samples and artifacts are the property of the United States government." See NASA Management Instruction 7100.10. However, subsequent permutations of this NMI do not contain that explicit language. NASA Policy Directive 1387.2F, effective February 29, 2000, sets standards for the use, control and loan of lunar samples for public and educational purposes. The policy asserts that lunar samples are a unique and limited national resource requiring careful allocation, coordination, and management control to produce maximum scientific and technological benefits. It is against NASA policy to consider requests for loans of lunar samples to individuals acting on their own behalf. NPD 1387.2F.1.f. Johnson Space Center is designated as the depository for lunar materials, and the JSC Center Director is charged with responsibility for control of and accountability for the lunar samples. NPD 1387.5.d.

**39.** According to the NASA-OIG, the value for scientific evaluation purposes of the missing lunar samples is approximately $1 million.

**40.** On July 17, 2002, **Robinson** sent a 12-page facsimile from a Kinko's in Houston to the facsimile number previously provided to **Robinson** by your affiant. The facsimile contained a narrative, which stated, in pertinent part:

>Attached are a few of the actual curatorial forms, F-75 Return Accountability, and History Records found with the samples. Also included is a copy of the security container information card kept in the safe with the matching identification sticker taken off the safe. Curatorial Forms are available for every sample. Other documents available upon

13



request include the Lunar Sample Holdings of Gibson, EK for 1999 and 2002. If you care to go the extra mile you could research a list of EK Gibson's publications and findings, thereby also verifying the properties and the authenticity of the samples.

I did not provide you with this evidence previously because the samples had not yet been acquired. My connection responsible for handling acquisition of the samples had bought the combinations to the building, room, and safe. Upon reaching the safe, however, he discovered that the combination was invalid. He then had no choice but to remove the entire safe---an exceedingly more complex task.

Unfortunately, the expected samples were not found in the safe. The good news is that many other samples, spanning each of the Apollo missions are now in my possession. I have attached a list cataloguing the majority of them.

I would like to stress that this is the **WORLDS LARGEST** *private* Apollo rock collection, not to mention the **ONLY VERIFIABLE** Apollo rock collection. I must make adjustments to my base prices for this material due in part to the fact that our contact raised his price substantially. I have been following "legal" purchases of lunar meteorites, which currently sell for $4000.00/g. This has also contributed to the price adjustment. Being that these are priceless treasures, but understanding that you---as a middleman---must expect to profit greatly from this deal to maintain interest, I have specified the prices in the following manner:

14

| Asking Prices | Expected Resell Prices |
|---|---|
| Rocks > 1.0 g = 8,000.00 / g | > 10,000.00 / g |
| Clean Samples = 5,000.00 / g | > 8,000.00 / g |
| Exposed Samples = 4,000.00 / g | > 7,000.00 / g |
| Crucible Samples = 2,000.00 / g | > 4,000.00 / g |

Depending upon your response to this information, I can envision 3 possible outcomes.

    1.) You are still interested and want to meet as planned to purchase many of theses samples. This will also give you the opportunity to view the entire collection, supporting possible future transactions.

    2.) You could decide to meet just to see the samples and all the evidence, and evaluate the situation at that point. This will allow both of us to gain more confidence in each other for potential future business transactions and will give you a greater understanding of the inventory. You could purchase some of them and set up a communication plan for future dealings or decide to cancel at that time.

    3.) You could opt to withdraw from meeting at this point and contact me should you change your mind in the future.

I am prepared for any of these options and apologize for this short notice of changes, but I must be able to profit in this deal as well, after meeting my contact's fee for the acquisition of the samples.

Please contact [CW], discuss these options and then respond to me by e-mail.

    **41.** On July 17, 2002, your affiant received, via facsimile from the NASA-OIG, an inventory as of September 16, 2001, listing the lunar samples contained in the safe that had been discovered missing from JCS sometime during the weekend of July 12-

15

14, 2002. The information sent via facsimile by **Robinson** on July 17, 2002 included many of the samples listed on the inventory.

42. On July 17, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

> All we can say is WOW!!!!! My husband called [CW] and I think [he/she] actually started doing back flips. We would definately like to meet as planned and purchase some specimens. [CW] also wanted to know if we could look at everything and maybe take some pictures of the remaining specimens and send them to [him/her] as well. [He/she] knows many potential buyers who would be interested.

43. On July 17, 2002, **Robinson**, using orb_robinson@hotmail.com, sent an E-mail to Lynn.Briley@verizon.net, which stated, in pertinent part:

> Great! I will meet you as planned saturday night at 6:00 at the previously discussed restaurant. Yes you may bring a camera to photograph all the specimens to send to [CW]. I will bring all of the specimens for you to look at and select from. If any more concerns or questions come up, please send me an e-mail before friday at noon. I will be leaving the Houston area at that time and will not have access to the internet after that. I look forward to meeting you and your husband.

44. On July 17, 2002, your affiant, posing as Lynn Briley, sent an E-mail to **Robinson** at orb_robinson@hotmail.com, which stated, in pertinent part:

> We are packed and ready to get an early start for Florida in the morning. We are looking forward to meeting you, too. My husband is bringing his digital camera to take pictures of the specimens, so we won't have to worry about getting film developed at a photo lab.

45. On July 20, 2002, at approximately 6:15 p.m., a white male, wearing a black-colored shirt and a silver necklace with a dolphin pendant, who was later identified as **Thad Ryan Roberts** (hereinafter "**Roberts**"), entered Italianni's restaurant, located at 8148 International Drive, Orlando, Florida 32819. **Roberts** approached an undercover FBI Agent (UCA) posing as Lynn Briley and identified himself as "**Orb**."

16

46.  **Roberts** apologized to the UCA for being late for their meeting. Later, **Roberts** explained that he had two friends watching them from inside the restaurant because his friends were concerned for **Roberts'** safety.

47.  **Roberts** and the UCA discussed their earlier E-mail communications regarding the lunar samples. **Roberts** described for the UCA how he and his friends had stolen the safe containing the lunar samples. **Roberts** even showed the UCA a bruise on his right arm that he said he had received in the course of removing the safe. **Roberts** told the UCA how he and others had opened the safe. **Roberts** added that he had not gotten much sleep in recent days because he had been working to match the stolen lunar samples with the corresponding authenticating documentation.

48.  **Roberts** advised the UCA that there were a total of four people, including himself, who knew about the theft and interstate transportation of the lunar samples. **Roberts** stated that two of the people were present in the restaurant. He said that one of the two people was his girlfriend and that she had driven with him from Houston, Texas, and that the other person had flown to Orlando. **Roberts** further stated that the fourth person, a woman, later identified as **Shae Lynn Saur**, could not make the trip to Florida because she was completing her scuba diving certification in Houston, Texas.

49.  **Roberts** told the UCA that the lunar samples and the authenticating documentation were in their hotel room at the Sheraton Hotel on International Drive near I-4. When the UCA asked **Roberts** if all of the lunar samples were in the hotel room, **Roberts** responded that he had left approximately two to three percent of the lunar samples in Houston, Texas, because he had not yet been able to match them with the corresponding authenticating documentation, but that all of the remaining lunar samples were in the hotel room.

50.  After further discussion, another undercover FBI Agent (UCA2), posing as the UCA's husband, and **Roberts'** friends joined the UCA and **Roberts** at their table in the restaurant. **Roberts'** friends introduced themselves as Tiffany and Gordon, respectively. Tiffany was later identified as **Tiffany Brooke Fowler**, and Gordon was later identified as **Gordon Sean McWhorter**. **McWhorter** looked at **Roberts** and asked, "Did you tell them how many grams we got?" **Roberts** shook his head and said that they had obtained 113 grams of lunar samples.

51.  The UCAs, **Roberts**, **McWhorter**, and **Fowler** agreed to travel to the Sheraton Hotel so that the UCAs could view the lunar samples, decide which samples to purchase with the $100,000 they had with them, and take digital photographs of the remaining samples for purposes of recruiting investors and making subsequent purchases. Specifically, they agreed that **Roberts** would ride in the UCAs' vehicle, and

that they would follow the vehicle occupied by **McWhorter** and **Fowler** to the Sheraton Hotel. During the ride to the hotel, **Roberts** recounted to UCA2 the story of how he and his friends had stolen the safe containing the lunar samples.

52. When both vehicles pulled into the Sheraton Hotel parking lot, other agents arrested **Roberts**, **McWhorter**, and **Fowler**.

53. Subsequently, **Roberts** waived his Miranda rights and admitted, among other things, that he had posed as **Orb Robinson** and that he had sent E-mails and the July 17, 2002 facsimile (described in paragraph 40 herein) to Lynn Briley. **Roberts** stated that both **Fowler** and **Saur** had helped him steal the safe from JSC and load it into a Jeep Cherokee sport utility vehicle. **Roberts** further stated that he and **Fowler** rented a motel room in Clearlake, Texas, where they took the safe and opened it. Thereafter, **Roberts** stated, he and **Fowler** discarded the safe in two different locations, and then placed the contents of the safe that they believed were "junk" in a storage unit being used by **Saur** in Beaumont, Texas.

54. **Fowler** waived her Miranda rights and admitted, among other things, that she had participated in the theft and interstate transportation of the lunar samples. **Fowler** further stated that **Saur** had helped her and **Roberts** steal the safe containing lunar samples from JSC.

55. Later, agents in Houston, Texas, located **Saur**. **Saur** waived her Miranda rights and agreed to speak with the agents. **Saur** told the agents, among other things, that she had helped **Roberts** and **Fowler** steal the safe from JSC and put it into a Jeep Cherokee SUV. **Saur** also took agents to the storage unit in Beaumont, Texas, and consented to a search of the storage unit. **Saur** turned over a white trunk and a box, which contained materials taken from the stolen safe, located inside the storage unit.

56. Based upon the foregoing facts, your affiant submits that there is probable cause to believe that **Tiffany Brooke Fowler, Gordon Sean McWhorter,** and **Shae Lynn Saur** did conspire to commit theft and transportation in interstate commerce of a

thing of value of the United States, in violation of Title 18, United States Code, Sections 371, 641 and 2314.

FURTHER, YOUR AFFIANT SAYETH NOT.

_____
Wayne Nichols Nance, Jr.,
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
on this 22 day of July 2002.

_____
Thomas B. McCoun, III
United States Magistrate Judge

N:bcoats/RDBedke/Robinson_2002R01367/complaint.affidavit2

19